COURT OF APPEALS
DECISION
DATED AND FILED

July 2, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1450**

STATE OF WISCONSIN

Cir. Ct. No. 2023GN197

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE GUARDIANSHIP OF C.R.R.:

KELLY R. ROSE,

    PETITIONER-RESPONDENT,

  V.

C.R.R.,

    RESPONDENT,

RUSSELL O. ROSE,

    INTERESTED PARTY-APPELLANT,

WAUKESHA COUNTY,

    INTERESTED PARTY.

---

       APPEAL from orders of the circuit court for Waukesha County: CODY J. HORLACHER, Judge. *Affirmed*.

Before Neubauer, Grogan, and Lazar, JJ.

¶1     LAZAR, J.  Russell O. Rose[1] appeals from orders denying one and dismissing another of two petitions for review of the conduct of his adult son's guardian, Kelly R. Rose.  He argues that these orders were legally erroneous because Kelly (his ex-wife) knowingly isolated their son ("Cory") from him in violation of WIS. STAT. § 54.68(2)(cm).  We conclude that the circuit court correctly denied or dismissed the petitions based on Russell's failure to prove that Cory was being "isolated" from Russell within the meaning of the statute for several reasons, including because Kelly was acting in Cory's best interest as § 54.68(2)(g) requires.  Russell is wrong as a matter of law that § 54.68(2)(cm) provides grounds for access to his adult son regardless of Cory's best interest.  We therefore affirm and decline to address the constitutional question of whether Cory's right to freedom of association renders Russell's petitions moot.

## BACKGROUND

¶2     Cory has Down's Syndrome and Autism Spectrum Disorder.  As a result, he has "significant delays in cognitive, language, and social functioning." For his entire life, Cory has needed significant care and constant oversight to ensure his safety and well-being.  After his parents' divorce in 2009, Cory was continually subject to family court orders that determined which parent was to have primary placement as well as the terms of visitation.  These orders would

---

[1] For clarity, appellant Russell O. Rose and respondent Kelly R. Rose are referred to by their first names.  Pursuant to the policy reflected in WIS. STAT. RULE 809.19(1)(g) (2023-24), we use the pseudonym "Cory" when referring to the ward, C.R.R.  All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

necessarily expire once Cory reached the age of 18. *See* WIS. STAT. § 767.41(2)(a).

¶3 On November 14, 2023, a few months before Cory's 18th birthday, Kelly filed a petition pursuant to WIS. STAT. § 54.34 to be appointed Cory's permanent guardian. Russell filed a cross-petition, seeking to be designated Cory's permanent guardian himself.

¶4 The circuit court[2] heard testimony from multiple witnesses (including three of Cory's healthcare providers) and reviewed extensive exhibits before appointing Kelly as Cory's sole guardian of the person on February 9, 2024. The court stated that "the overwhelming evidence … is that [Kelly] is not only an acceptable, prudent person for this Court to appoint, but that she's the only person that this Court can appoint into this role." In explaining its decision, the court pointed to evidence that showed significant behavioral issues "coming from [Russell]" for which Cory was getting treatment and stated that Russell would "have to sit by and see how the medical professionals and the treatment bears out in terms of whether or not [Cory] can get back to a position where he can have meaningful contact with [his father] in a way that doesn't set him back."

¶5 Several weeks after the circuit court issued its guardianship decision, Cory turned 18. The family court order that had provided placement with Russell for 24 hours every other weekend (while granting primary physical placement to Kelly) expired. Notably, that June 30, 2023 order[3] (which had substantially

---

[2] The Honorable Michael P. Maxwell presided over the initial guardianship proceedings.

[3] The Honorable William J. Domina presided over the most recent custody motions and made the findings noted here.

3

decreased Russell's placement and which was submitted as evidence in the guardianship case) included multiple factual findings regarding Cory's best interest, including:

- Cory has picked up Russell's language, which is often "racist, obscene or offensive."

- Russell has a history of providing insufficient oversight of Cory when Cory has been in his care, as evidenced by two incidents in particular: Cory discovering and taking car keys from Russell's home in 2019 (where he was left with only Russell's then 80-year-old mother) and getting seriously injured in an automobile accident and Cory wandering the neighborhood in 2022 after having been left alone at Russell's house.

- Russell has "actively and passively opposed" Cory's medical treatment and "has no plan" for Cory after the conclusion of his involvement with school, which Russell wanted to occur in the spring of 2024.

- Russell's "obscene and confrontational behavior … stresses [Cory] incredibly" and "places him in a position of less stability and regulation in his daily life."

¶6      Russell filed his first petition for review of conduct[4] on February 29, 2024, stating that Kelly, as guardian, had advised him on the date of appointment (February 27) that she would "eliminate ANY contact, communication, visitation, [and] vacation" between Cory and Russell other than a monthly email, which he asserted was a violation of WIS. STAT. § 54.68(2)(cm).  The circuit court[5] appointed advocate counsel for Cory on March 8.  Through advocate counsel, Cory filed a motion to dismiss Russell's first petition based on res judicata (given that Russell's petition was filed only 20 days after the court's February 9, 2024 guardianship decision) and on his asserted right to freedom of association (due to his expressed wish not to see Russell).  The court denied the motion to dismiss based on its need to "assess" Cory's capability "to freely exercise his ability to associate or to not associate" and to determine whether "additional issues … occurred during that 20-day window" between the guardianship decision and Russell's petition.  Although both Cory's advocate counsel and guardian ad litem requested that Cory's appearance be waived, the court ordered Cory to appear by videoconference.

¶7      At the hearing on Russell's petition, the circuit court conducted a colloquy with Cory to "ascertain [Cory's] level of decision making."  Acting pro se, Russell then called several witnesses, including Kelly:

---

[4] Like the circuit court, we refer to Russell's filings giving rise to this appeal in these terms.  *See* WIS. STAT. § 54.68(3) (referring to a "petition for review of … conduct").  Russell filed what he titled a "Notice of Motion and Motion for Review of Conduct of Guardian" on February 29, 2024, and again on June 12, 2024, along with a separate petition in conjunction with the latter filing.

[5] Due to judicial rotation, the Honorable Cody J. Horlacher presided over the petitions giving rise to this appeal.

[Russell:] So you are withholding my son from me; correct?

[Kelly:] For very good reasons. Yes, I am.

[Russell:] Those reasons are supported by professional opinion or no?

[Kelly:] Some of them are, yes.

….

[Russell:] Do you have any professional opinions stating that he shouldn't see me?

[Kelly:] Yes. Dr. Sengstock testified [at a previous hearing] that anybody who disregulates him, who can't keep their emotions in check, who swears in front of him will cause him to do the same.

¶8      Testifying on her own behalf, Kelly stated that she intended to obtain behavior modification treatment for Cory (through a sought-after therapist by the name of Dr. Tiger) to address Cory's "number one problem"—use of the racial slurs and inappropriate language learned from Russell that has prevented him from being allowed to participate in community programming. Her plan with respect to Russell's future contact with Cory was to "rely on Dr. Tiger," who had made it clear that Cory "cannot have outside influences" during the intensive period of treatment. Kelly also called Ethan,[6] Cory's adult brother, who testified at length about the negative effects interactions with Russell had on Cory. Among these, Ethan stated that it would usually take about two days for Cory to "re-acclimate" after visits with Russell—to stop throwing things, hitting, and swearing and to "become happy again."

---

[6] "Ethan" is also a pseudonym.

6

¶9 The circuit court made its oral ruling denying Russell's petition at the conclusion of testimony on May 24, 2024. It noted that, pursuant to WIS. STAT. §§ 54.68 and 50.085(2), "[t]he Court may not issue an order compelling visitation if the Court finds … [that Cory], while having the capacity to evaluate and communicate decisions regarding visitation, expressed a desire not to have visitation with [Russell]" or that "visitation between [Russell] and [Cory] is not in the best interest of [Cory]." The court then concluded that Kelly was, in fact, "acting in [Cory's] best interest" and therefore not "isolating" Cory from his father. It specifically noted the "fact that [Cory] swears and says different things that are inappropriate in a general community setting [is] certainly something that needs to be dealt with in order to be able to have him actively engage and be a well-functioning member of society" and stated that, "from that standpoint, the work that [Kelly] is trying to do is in furtherance of that" as is her denial of Cory's contact with Russell "based off the recommendation … by Dr. Tiger." With respect to Cory's argument that visitation with Russell violated his freedom of association, however, the court concluded that "in [Cory]'s current state," he was not "able to freely exercise that First Amendment right."

¶10 Accordingly, the circuit court entered its written order denying Russell's first petition on June 10, 2024. Only two days later, on June 12, Russell filed another petition. He again asserted that Kelly was isolating Cory from him in violation of WIS. STAT. § 54.68(2)(cm) and alleged that there was new information showing that Kelly had "lied to the Court": an email purportedly from Dr. Tiger stating that he "ha[d] not and [would] not make any recommendations until [he] ha[d] spent a good deal more time with [Cory]."

¶11 Kelly filed a motion to dismiss, which the circuit court granted on July 8 in an oral ruling after a hearing. The court stated that it "was not basing any

7

of its findings [supporting its decision on Russell's first petition] off any type of medical recommendation."[7]  Instead, that decision was based on "[Kelly] doing what's in [Cory]'s best interest and … doing her job as the guardian," which includes minimizing Cory's dysregulation and keeping him in appropriate treatment and programming.  The court also granted sanctions against Russell, characterizing his filing of another petition just three weeks after the decision on his first one as "completely inappropriate" and nothing more than "badgering" Kelly and Cory.

¶12  Russell appeals both the June 10, 2024 order denying his first petition and the July 17, 2024 order dismissing his second petition.

## STANDARD OF REVIEW

¶13  WISCONSIN STAT. § 54.68(4) provides that "after finding cause as specified in sub. (2)," a circuit court "may" choose from a number of remedies, including removing the guardian or entering an order to compel the guardian to carry out his or her duties.  We construe the use of the word "may" as the legislature's signal that the decision whether to take action (and what action to take) in the event of a violation of § 54.68(2) is within the discretion of the circuit court.  *See **Linda L. v. Collis***, 2006 WI App 105, ¶72, 294 Wis. 2d 637, 718 N.W.2d 205 (construing former guardianship statute, WIS. STAT. § 880.16(2) (2003-04)).  The court's decision will be upheld if it is rational and based on an application of the correct legal standard to the facts in the record.  ***Linda L.***, 294

---

[7] The circuit court also expressed concern about the authenticity of the email purportedly from Dr. Tiger given evidence at a previous hearing that suggested other emails presented by Russell had been "doctored."  Regardless, as the court stated, "[t]hat's not what this is about."

Wis. 2d 637, ¶72. "We accept all findings of fact made by the circuit court unless they are clearly erroneous." *Id.*; WIS. STAT. § 805.17(2). Whether the court applied the correct legal standard, however, is a question of law that we review independently. *See LeMere v. LeMere*, 2003 WI 67, ¶14, 262 Wis. 2d 426, 663 N.W.2d 789.

¶14 "Questions of statutory interpretation are questions of law that we review independently." *State v. Mercado*, 2021 WI 2, ¶32, 395 Wis. 2d 296, 953 N.W.2d 337. Even with this de novo review, we may "benefit from the analys[i]s of the circuit court." *Waity v. LeMahieu*, 2022 WI 6, ¶18, 400 Wis. 2d 356, 969 N.W.2d 263 (quoting *Estate of Miller v. Storey*, 2017 WI 99, ¶25, 378 Wis. 2d 358, 903 N.W.2d 759). This court, however, may still conduct its statutory interpretation "without deference to the [circuit] court's decision." *Murr v. Saint Croix Cnty. Bd. of Adjustment*, 2011 WI App 29, ¶9, 332 Wis. 2d 172, 796 N.W.2d 837.

¶15 We have a "solemn obligation ... to faithfully give effect to the laws enacted by the legislature." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. In conducting statutory interpretation, we first look to the language of the statute because "[w]e assume that the legislature's intent is expressed in the statutory language." *Id.*

¶16 Generally, "[s]tatutory language is given its common, ordinary, and accepted meaning." *Id.*, ¶45. That "language is interpreted in the context in which it is used; … in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46. In the course of our plain-meaning interpretation, we may also consider a statute's scope, context, and purpose so long as they "are ascertainable from the text and structure

9

of the statute itself." *Id.*, ¶48. This is because the statute has to be read as a whole; we cannot disregard context and syntax. As well, we may look to statutory history to ascertain a statute's plain meaning. *Richards v. Badger Mut. Ins. Co.*, 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581; *State v. Cox*, 2018 WI 67, ¶10, 382 Wis. 2d 338, 913 N.W.2d 780.

## DISCUSSION

¶17    Russell asserts that Kelly "is knowingly isolating [Cory] from his family" in violation of WIS. STAT. § 54.68(2)(cm) and that WIS. STAT. § 54.25(1)(b), which requires a guardian to act in a ward's "best interests," cannot provide "safe harbor" from such a violation.

### I. Kelly did not "isolate" Cory in violation of WIS. STAT. § 54.68(2).

¶18    Again, WIS. STAT. § 54.68(2)(cm) provides that "[k]nowingly isolating a ward from the ward's family members or violating a court order under [WIS. STAT. §] 50.085(2)" is "cause for court action against a guardian." The statute does not explicitly define what it means to "isolat[e]" a ward, so we must interpret this term to give effect to the legislature's intent. *See Kalal*, 271 Wis. 2d 633, ¶44. The meaning of "isolate" is relatively plain. To "isolate" means, among other things, "to set apart from others." *Isolate*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/isolate (last visited June 11, 2025). We may consult "a recognized dictionary to determine the common and ordinary meaning of [a] word." *Robin K. v. Lamanda M.*, 2006 WI 68, ¶16, 291 Wis. 2d 333, 718 N.W.2d 38 (citations omitted).

¶19    As Russell points out, Kelly admitted to "withholding" Cory—setting him apart—from Russell. But we cannot disregard context or legislative

10

purpose as expressed in "surrounding or closely-related statutes" when we interpret the law. *See Kalal*, 271 Wis. 2d 633, ¶49. Here, WIS. STAT. § 54.68(2)(cm)'s incorporation of WIS. STAT. § 50.085 and the presence of paragraph (g) in the same subsection of § 54.68(2) make clear that a guardian's determination that denying contact with a family member is in the ward's best interest is not cause for court action against a guardian.

¶20    WISCONSIN STAT. § 54.68(2)(cm) explicitly incorporates WIS. STAT. § 50.085 in its prohibition on isolating wards from family members. Section 50.085(2), found in a subchapter governing residential care facilities, permits a court to enter an order compelling visitation of a resident of such a facility by a family member being denied visitation—*unless* the court finds that either "[t]he resident, while having the capacity to evaluate and communicate decisions regarding visitation, expresses a desire to not have visitation with that family member" or "[v]isitation between the petitioning family member and the resident is not in the best interest of the resident." Sec. 50.085(2)(a)-(b). That the legislature would protect a resident of a care facility from forced visitation with a family member when such visitation is not in the resident's best interest but would not protect a ward from forced visitation that was not in the ward's best interest— particularly when the statutes addressing visitation are so explicitly linked—would be an absurd interpretation. *See Kalal*, 271 Wis. 2d 633, ¶46 ("[S]tatutory language is interpreted … reasonably, to avoid absurd or unreasonable results.").

¶21    Perhaps even more compellingly, WIS. STAT. § 54.68(2)(g)—another paragraph in the very same subsection as § 54.68(2)(cm)—makes "[f]ailing to act

11

in the best interests of the ward" another cause for action against a guardian.[8]  The only way to reconcile these causes for action is to interpret paragraph (cm), which prohibits "isolating" a ward from a family member, as excluding denials of visitation based on the ward's best interest.  According to Russell's interpretation, where denying visitation between a ward and a family member is a cause for action regardless of the ward's best interest,[9] it would be impossible for a guardian to comply with her duties if contact between a family member and a ward is not in the ward's best interest—again, an absurd result.  *See* **Kalal**, 271 Wis. 2d 633, ¶46.

¶22    Russell does not meaningfully engage in a statutory interpretation analysis in his brief to this court or address the provisions discussed above.  Ignoring the legislature's mandate that a guardian act in a ward's best interest in another paragraph of WIS. STAT. § 54.68(2)—the same subsection he relies on—he argues that a guardian's obligations to act in the best interest of a ward under another section—WIS. STAT. § 54.25—may be a "baseline expectation" akin to a driver's obligation to drive safely, but that, just as a driver should be ticketed for running a red light even if it is safe to do so, Kelly should be subject to remedy of the court under § 54.68(4).  His analogy is not helpful to him.  If it is a baseline expectation to act in a ward's best interest, just as it is a baseline expectation to drive safely, a guardian's decision to deny contact with a family member based on

---

[8] Indeed, the statute repeatedly stresses the duty of a guardian to act in a ward's best interest; WIS. STAT. § 54.68(2)(j) lists as additional causes for action failing to perform any duties specified in WIS. STAT. § 54.18, which includes "advocat[ing] for the ward's best interests," and WIS. STAT. § 54.25, which includes "[e]ndeavor[ing] to secure any necessary care or services for the ward that are in the ward's best interests."  Secs. 54.18(2)(b), 54.25(1)(b).

[9] This is indeed Russell's position.  In his reply brief, he states, "[e]ven if, for the sake of argument, the Guardian did act in the best interests of [Cory], that does not excuse a violation of [§] 54.68(2)(cm)."

the ward's best interest is like a safe driver's obligation to stop at a green light to avoid collision with a vehicle stalled in the intersection, for example. Both permitting contact with a family member and driving through a green light are generally permitted or even required—except when they are contrary to a baseline expectation of acting in a ward's best interest or driving safely.

¶23     Our interpretation of the statute at issue is that WIS. STAT. § 54.68(2) does not provide for a cause for action against a guardian based on denying contact between a ward and a family member when the family member's visitation is not in the best interest of the ward. Thus, contrary to Russell's argument, the circuit court applied the correct standard of law in denying his initial petition. Russell's only path for reversal would require a showing that the court's order was irrational or not based on the facts of record. *See **Linda L.***, 294 Wis. 2d 637, ¶72. Here, there is ample evidence supporting the conclusion that Kelly was acting in Cory's best interest by denying contact with Russell, and Russell makes no coherent argument to the contrary. Although he says the "Circuit Court Found Guardian was Isolating the Ward," the court made no such finding. It explicitly stated, based on its finding that "[Kelly] is acting in [Cory]'s best interest," that Kelly "has [not] violated her conduct" and "is [not] isolating under (cm), based off of [WIS. STAT. §] 50.085, considering the best interests at this stage." The court's denial of Russell's first petition did not constitute an erroneous exercise of discretion.

¶24     Russell's argument that the circuit court committed legal error in dismissing his second petition also fails for at least the reason that the second petition is based on the same asserted "isolation" of Cory as the first which, as we have discussed, does not violate the statute because the court found (and Russell does not refute) that it was in Cory's best interest. The Record belies Russell's

assertion that submission of "new information" with his second petition—the email purportedly from Dr. Tiger saying that he had not yet made any recommendations regarding Cory—has any relevance. Even if Russell's factual contentions were proved true, the court explained that "[neither] Dr. Tiger, nor any other medical professional, testified at the [hearing on the first petition]. From that standpoint, the Court was not basing any of its findings off any type of medical recommendation." Instead, the court relied on the extensive testimony from Kelly, Ethan, and other witnesses to determine that Cory's behavioral issues, including use of inappropriate language that prevented him from beneficial programming and the dysregulation he experienced as a result of contact with Russell, "need[ed] to be dealt with" and that Kelly was acting "in furtherance" of that goal in denying contact with Russell.

## II. There is no need to address Cory's "freedom of association" argument.

¶25 Finally, we note that Kelly, Waukesha County, Cory (through advocate counsel), and Cory's guardian ad litem all urge this court to affirm the circuit court's ruling based on Cory's constitutional[10] and statutory[11] rights to freedom of association, arguing that, although the circuit court reached the correct result, it should have done so on those grounds. Russell apparently agrees that "[Cory] has free will to associate with whomever he likes regardless of his status as a Ward" and requests remand to determine whether Cory does, in fact, want to see him. Because we affirm based on our interpretation that WIS. STAT. § 54.68(2)(cm) excludes denial of contact with a family member based on the best

---

[10] *See* U.S. CONST. amend. I.

[11] *See* WIS. STAT. §§ 54.01(18), 54.10(3)(e), 54.18(1), 54.25(2)(b)7.

interest of the ward from the definition of "isolating," we need not reach the issue of whether the court's conclusion that Cory did not have capacity to make his own decision regarding association with Russell is in error. *See **Labor & Farm Party v. Elections Bd.***, 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984) (declining to reach constitutional issues when "case can be resolved on statutory construction grounds alone").

¶26 For the foregoing reasons, we affirm.

*By the Court.*—Orders affirmed.

Recommended for publication in the official reports.